683 F.2d 1253
 17 ERC 1857, 12 Envtl. L. Rep. 21,084
 The STATE OF CALIFORNIA, acting By and Through Governor
Edmund G. BROWN, Jr., the California Coastal Commission, the
California Air Resources Board, the California Resources
Agency, the California Department of Fish and Game, the
California Department of Conservation, Plaintiffs-Appellees,
v.
James G. WATT, as Secretary of the Interior; the United
States Department of the Interior; Edward Hastey, as Acting
Director of the United States Bureau of Land Management;
Robert Burford, as Director Designate of the United States
Bureau of Land Management, in his official capacity as
Director when and if assumed; the United States Bureau of
Land Management, Defendants,
Western Oil and Gas Association, a regional trade
association; Amoco Production Company, a corporation;
Atlantic Richfield Company, a corporation; Champlin Refining
Company, a corporation; Chevron U. S. A. Inc.; Cities
Service Company, a corporation; Conoco, Inc.; Elf Acquitaine
Oil and Gas, a corporation; Exxon Corporation; Getty Oil
Company, a corporation; Gulf Oil Corporation; Phillips
Petroleum Company, a corporation; and Shell Oil Company, a
corporation, Defendants-in-Intervention/Appellants.
NATURAL RESOURCES DEFENSE COUNCIL, INC.; the Sierra Club;
Friends of the Earth; Friends of the Sea Otter;
and the Environmental Coalition on Lease
Sale 53, Plaintiffs-Appellees,
v.
James G. WATT, as Secretary of the Interior, etc., et al., Defendants,
Western Oil and Gas Association, a regional trade
association, etc., et al.,
Defendants-in-Intervention/Appellants.
STATE OF CALIFORNIA, acting By and Through Governor Edmund
G. BROWN, Jr., etc., et al., Plaintiffs-Appellees,
County of Humboldt; County of Marin; County of Mendocino;
County of Monterey; County of San Luis Obispo; County of San
Mateo; County of Santa Barbara; County of Santa Clara;
County of Santa Cruz; County of Sonoma; City and County of
San Francisco; City of Brisbane; City of Capitola; City of
Carmel-By-the-Sea; City of Los Angeles; City of Morro Bay;
City of Pismo Beach; City of San Luis Obispo; City of Santa
Barbara; City of Santa Cruz; City of Santa Monica; City of
Seaside; Association of Monterey Bay Area Governments,
Plaintiffs-in-Intervention/Appellees,
v.
James G. WATT, as Secretary of the Interior, etc., et al.,
Defendants-Appellants.
NATURAL RESOURCES DEFENSE COUNCIL, INC., etc., et al., Plaintiffs,
County of San Diego, Plaintiff-in-Intervention/Appellant,
v.
James G. WATT, as Secretary of the Interior, etc., et al.,
Defendants-Appellees,
Western Oil and Gas Association, a regional trade
association, etc., et al.,
Defendants-in-Intervention/Appellees.
NATURAL RESOURCES DEFENSE COUNCIL, INC., etc., et al.,
Plaintiffs-Appellants,
v.
James G. WATT, as Secretary of the Interior, etc., et al.,
Defendants-Appellees.
STATE OF CALIFORNIA, acting By and Through Governor Edmund
G. BROWN, Jr., etc., et al., Plaintiffs,
County of San Diego, Plaintiff-in-Intervention/Appellant,
v.
James G. WATT, as Secretary of the Interior, etc., et al.,
Defendants-Appellees,
Western Oil and Gas Association, a regional trade
association, etc., et al.,
Defendants-in-Intervention/Appellees.
NATURAL RESOURCES DEFENSE COUNCIL, INC., etc., et al., Plaintiffs,
County of Humboldt, etc., et al.,
Plaintiffs-in-Intervention/Appellants,
v.
James G. WATT, as Secretary of the Interior, etc., et al.,
Defendants-Appellees,
Western Oil and Gas Association, a regional trade
association, etc., et al.,
Defendants-in-Intervention/Appellees.
The STATE OF CALIFORNIA, acting By and Through Governor
Edmund G. BROWN, Jr., etc., et al., Plaintiffs-Appellants,
County of Humboldt, etc., et al., Plaintiffs-in-Intervention,
v.
James G. WATT, as Secretary of the Interior, etc., et al.,
Defendants-Appellees,
Western Oil and Gas Association, a regional trade
association, etc., et al.,
Defendants-in-Intervention/Appellees.
NATURAL RESOURCES DEFENSE COUNCIL, INC., etc., et al.,
Plaintiffs-Appellees,
County of Humboldt, etc., et al., Plaintiffs-in-Intervention/Appellees,
v.
James G. WATT, as Secretary of the Interior; etc., et al.,
Defendants-Appellants.
The STATE OF CALIFORNIA, acting By and Through Governor
Edmund G. BROWN, Jr., etc., et al., Plaintiffs,
County of Humboldt, etc., et al.,
Plaintiffs-in-Intervention/Appellants,
v.
James G. WATT, as Secretary of the Interior, etc., et al.,
Defendants-Appellees.
 Nos. 81-5699 to 81-5701, 81-5811 to 81-5815, 81-5720 and 81-5822.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 15, 1982.
Decided Aug. 12, 1982.
 
 Theodora Berger, Deputy Atty. Gen., Los Angeles, Cal., for State of cal.
 Donatas Januta, San Francisco, Cal., argued, for Coastal Counties and Cities; Irwin D. Karp, Januta & Karp, San Francisco, Cal., on brief.
 Greer Knopf, Deputy County Counsel, San Diego, Cal., for San Diego County.
 Trent W. Orr, Natural Resources Defense Council, San Francisco, Cal., argued, for Natural Resources Defense Counsel; Sarah Chasis, Natural Resources Defense Council, New York City, Julie E. McDonald, Sierra Club Legal Defense Fund, San Francisco, Cal., on brief.
 E. Edward Bruce, Covington & Burling, Washington, D. C., for Watt, Western Oil & Gas Ass'n, et al.
 Peter R. Steenland, Jr., Atty., Dept. of Justice, Washington, D. C., for U. S.
 H. Bartow Farr, III, Joseph N. Onek, Peter E. Scheer, Onek, Klein & Farr, Washington, D. C., for amicus curiae Coastal States Organization.
 Appeal from the United States District Court for the Central District of California.
 Before SNEED, TANG and PREGERSON, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 This appeal concerns a dispute over the proposed sale by the United States Department of Interior of leases to drill for and extract oil and gas in the outer continental shelf (OCS) off the coast of California.
 
 
 2
 Plaintiffs below were the State of California and various agencies within the state. Intervening as plaintiffs were various cities and counties in California (hereafter "local governments"). Plaintiffs in a companion case, which was consolidated with this one, were the Natural Resources Defense Council, the Sierra Club, Friends of the Earth, Friends of the Sea Otter, and the Environmental Coalition on Lease Sale 53 (hereafter "environmental groups"). Defendants in both cases below were James G. Watt, acting in his official capacity as Secretary of the Interior, the Department of Interior, Robert Burford, acting in his official capacity as Director of the Bureau of Land Management, and the Bureau of Land Management (BLM). Intervening as defendants in both actions were Western Oil and Gas Association (WOGA), a regional trade association of companies and individuals in the petroleum industry, and various oil companies that had submitted high bids on one or more tracts offered in Lease Sale No. 53.
 
 
 3
 Plaintiffs claimed below that defendants violated five federal statutes in offering for competitive bidding certain oil and gas leases on tracts located in the Santa Maria Basin. Finding that there were no genuine issues of material fact in the two consolidated cases, the district court granted summary judgment to the plaintiffs on their claim based on the Coastal Zone Management Act (CZMA), granted summary judgment to defendants on the remaining issues, and dismissed the claims of the environmental groups for lack of standing. The court enjoined leasing of the disputed tracts and ordered the bids and deposits returned but stayed the effect of the latter order pending appeal.[1] All parties appealed. We affirm in part, reverse in part, vacate in part, and stay in part.
 
 I.
 ISSUES ON APPEAL
 
 4
 There are four issues on appeal which we state as follows:
 
 
 5
 1. CZMA Issue: Did the Secretary of Interior violate Section 307(c)(1) of the CZMA by selling oil and gas leases for the outer continental shelf without a determination of consistency with California's coastal zone management plan? Our answer is that he did.
 
 
 6
 2. NEPA Issue: Did the Department of Interior violate the National Environmental Policy Act (NEPA) by failing to supplement the Environmental Impact Statement? Our answer is that it did not.
 
 
 7
 3. OCSLA Issue: Did the Secretary violate section 19 of the Outer Continental Shelf Lands Act (OCSLA) by refusing to accept the recommendations of the Governor of the State of California regarding Lease Sale 53? Our answer is that he did not.
 
 
 8
 4. Standing Issue: Do the environmental groups have standing to enforce the consistency determination provision of the CZMA? Our answer is that they do.
 
 II.
 STANDARD OF REVIEW
 
 9
 As already noted, summary judgment was granted by the district court on all issues. Our review is identical to that of the district court. Washington ex rel. Edwards v. Heimann, 633 F.2d 886, 888 n.1 (9th Cir. 1980). That is, we may affirm a summary judgment only if, viewing the evidence in the light most favorable to the party against whom it is granted, we find no genuine issue of material fact, and we find that the prevailing party is clearly entitled to judgment as a matter of law. Id. at 888; Dosier v. Miami Valley Broadcasting Corp., 656 F.2d 1295, 1300 (9th Cir. 1981).
 
 III.
 FACTS AND BACKGROUND
 
 10
 While the facts and background of these cases are complex, they are thoroughly laid out in the district court opinion. California v. Watt, 520 F.Supp. 1359, 1365-68 (C.D.Cal.1981). To aid the reader of this opinion, however, we shall summarize briefly the pertinent facts and background of these cases.
 
 
 11
 The lease sale in dispute is Lease Sale 53, consisting of a maximum offering of 243 designated tracts of the OCS for mineral development. The tracts in Lease Sale 53 lie in five different basins off the coast of California, including the Santa Maria Basin. That basin extends generally from Point Sur in Monterey County in the north to Point Conception in Santa Barbara County in the south. During the course of decision-making on Lease Sale 53, the Department of Interior at various times proposed leasing within the Santa Maria Basin only and at other times within all five of the basins originally included.
 
 
 12
 In November 1977, BLM issued a Call for Nominations for Lease Sale 53. The Call requested the petroleum industry to designate specific tracts on which it was interested in bidding if a sale were held. It also asked federal, state, and local governments, universities, environmental organizations, research institutions, and the public to identify specific tracts that they believed should be excluded from leasing or should be leased under particular restrictions due to conflicting resource values or environmental factors. In October 1978 the Department of Interior announced the tentative tract selection for Lease Sale 53. The Santa Maria Basin contained 115 of the 243 tracts involved in the sale.
 
 
 13
 A draft Environmental Impact Statement (EIS) was released for public comment in April 1980. The draft EIS, which analyzed the environmental impacts in the five basins to be included in Lease Sale 53, was based on a reserve estimate of 404 million barrels of oil for the Santa Maria Basin.
 
 
 14
 In September, 1980, a final EIS was released. Shortly before its publication, on or about August 28, 1980, the United States Geological Survey made available revised reserve estimates for the Santa Maria Basin in the amount of 794 million barrels of oil. The revised estimate was incorporated in an addendum to the EIS. A Secretary Issue Document (SID), an internal document intended to aid the Secretary in making decisions concerning lease sales, was released in October 1980. The SID concerned the potential impact of Lease Sale 53 on the environment, and concluded that a supplemental EIS was not needed.
 
 
 15
 On July 6, 1980, the California Coastal Commission requested that the Secretary submit a consistency determination at the time of the issuance of the proposed notice of sale. On October 16, 1980, the former Secretary of the Interior, Cecil D. Andrus, issued the proposed notice of sale for Lease Sale 53. The notice proposed leasing only within the Santa Maria Basin, the four other basins being deleted from the proposed sale. By letter of October 22, 1980, the Department of Interior notified the California Coastal Commission (CCC) of its "negative determination," to the effect that the preleasing activities associated with Lease Sale 53 would have no "direct effects" on California's coastal zone, and that as a consequence no consistency determination was necessary. In response to this negative determination, on December 16, 1980, the CCC adopted a resolution that the deletion of 29 tracts in the northern portion of the Santa Maria Basin was necessary in order for Lease Sale 53 to be consistent with the California Coastal Management Plan. On December 24, 1980, Governor Edmund G. Brown, Jr. of California, responding to Secretary Andrus' proposed notice of sale, recommended the deletion of 32 tracts located in the northern portion of the Santa Maria Basin.
 
 
 16
 The new Secretary of Interior, James G. Watt, issued a revised proposed notice of sale for Lease Sale 53 on February 10, 1981. The four basins previously deleted from the proposed sale by former Secretary Andrus were once more included in the sale. The revised notice continued to propose leasing in the Santa Maria Basin. In transmitting the revised proposal to Governor Brown, Secretary Watt requested recommendations pursuant to section 19 of the OCSLA, 43 U.S.C. § 1345. By letter dated April 7, 1981, Governor Brown submitted his recommendations concerning the revised Lease Sale 53. He reiterated his position that, based upon the balancing test of section 19, the northern 32 tracts in the Santa Maria Basin should be deleted from the sale. Enclosed with the letter detailing Governor Brown's recommendations were comments and recommendations from various state agencies and local governments in California.
 
 
 17
 On April 10, 1981, the Department of Interior issued a news release in which Secretary Watt announced that he planned to divide Lease Sale 53 into two sales, with the sale of the tracts in the Santa Maria Basin to be held in May 1981 and the sale of the remaining tracts to be postponed. The Secretary stated that his decision to lease the entire Santa Maria Basin was based on a finding of overriding national interest. The final notice of sale for Lease Sale 53, Santa Maria Basin, was published on April 27, 1981.
 
 
 18
 By letter dated May 1, 1981, Secretary Watt notified Governor Brown of the rejection of California's recommendations concerning the lease sale in the Santa Maria Basin, and provided a brief explanation of the basis for the rejection.
 
 
 19
 On April 29, 1981, California sought an injunction in district court against the lease sale. The court, although it allowed bids on the tracts to be received and opened, on May 27, 1981, granted a preliminary injunction which prevents the Department of Interior from accepting or rejecting the bids or issuing leases on the disputed tracts. California and the local governments moved for summary judgment on their claim that Lease Sale 53 violated numerous statutes. Secretary Watt and the other federal defendants cross-claimed for summary judgment on the same issues. The response of the district court to these motions has already been indicated.
 
 
 20
 We find that no genuine issue of material fact exists. The questions before us, therefore, are whether the parties prevailing below are clearly entitled to their judgments as a matter of law. We now turn to the four legal issues with which this appeal is concerned.
 
 IV.
 COASTAL ZONE MANAGEMENT ACT
 
 21
 This issue concerns the application of CZMA Section 307(c)(1), 16 U.S.C. § 1456(c)(1), to the lease sale stage of outer continental shelf (OCS) oil, gas, and mineral development. Section 307(c)(1) reads:
 
 
 22
 Each Federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs.
 
 
 23
 While it is conceded on appeal that this section does apply at the lease sale stage, the parties vigorously dispute whether Lease Sale 53 would have "direct effects" on California's coastal zone.
 
 
 24
 We hold that Lease Sale 53 would "directly affect" the state's coastal zone. The district court so held and we agree. The federal appellants and oil companies (hereafter collectively referred to as "federal appellants") propose a definition of "directly affecting" that limits the scope of direct effects from a lease sale to those effects that "are part of, or immediately authorized by, a lease sale." See Brief For The Federal Appellants at 21-22; Brief of Appellants Western Oil & Gas Association at 27. Subsequent steps such as the promulgation of exploration or development plans are not direct effects of the lease sale, their argument runs, because separate consistency determinations are required at each of these later stages. It follows that a lease sale has no direct effects upon the coastal zone; such direct effects as there may be affect things other than the coastal zone. This definition and reasoning underlies the Secretary of Interior's determination that no consistency determination is required.
 
 
 25
 California, the local governments, and the amici curiae environmental groups (hereafter collectively referred to as "California") propose a broader definition of "directly affecting," encompassing effects of the lease sale that the lessor "reasonably anticipates." Another formulation of this definition is that any activity having a functional interrelationship from an economic, geographic, or social standpoint with lands and waters in the coastal zone directly affects the coastal zone. The district court adopted this broad definition, holding that the federal appellants "cannot deny that leasing activities have consequences in the coastal zone by pointing to a series of events which occur after the leases are issued, but before the actual effects are realized." California v. Watt, supra, 520 F.Supp. at 1379-80.
 
 
 26
 We agree that the lease sale in this case directly affects the coastal zone. These direct effects of Lease Sale 53 on California's coastal zone are detailed by the district court. Id. at 1371, 1380-82. We need not repeat them here. It is enough to point out that decisions made at the lease sale stage in this case establish the basic scope and charter for subsequent development and production. Prior to the sale of leases, critical decisions are made as to the size and location of the tracts, the timing of the sale, and the stipulations to which the leases would be subject. These choices determine, or at least influence, whether oil will be transported by pipeline or ship, which areas of the coastal zone will be exposed to danger, the flow of vessel traffic, and the siting of on-shore construction. Id.
 
 
 27
 Under these circumstances Lease Sale 53 established the first link in a chain of events which could lead to production and development of oil and gas on the individual tracts leased. This is a particularly significant link because at this stage all the tracts can be considered together, taking into account the cumulative effects of the entire lease sale, whereas at the later stages consistency determinations would be made on a tract-by-tract basis under section 307(c)(3). The narrow definition of "directly affecting" urged upon us by the federal appellants would diminish the ability of the state to protect its coastal zone and to influence activities that were set in motion at the lease sale stage.
 
 A. Purpose of the CZMA
 
 28
 This diminution would not be consistent with the purposes of the CZMA, which was enacted to promote the preservation of natural resources in the coastal zone. 16 U.S.C. § 1452(1). Under the Act, each coastal state has primary authority over the lands and waters within its three-mile coastal zone, to be exercised "in cooperation with Federal and local governments and other vitally affected interests." 16 U.S.C. § 1451(i).
 
 
 29
 A key element in the CZMA's comprehensive plan is the voluntary adoption by each coastal state of a federally-approved coastal zone management plan, which must adequately consider the "national interest" and "the views of Federal agencies principally affected by such program." 16 U.S.C. §§ 1455(c)(8), 1456(b). The Act requires the state's plan to include "a planning process for energy facilities likely to be located in, or which may significantly affect, the coastal zone, including, but not limited to, a process for anticipating and managing impacts from such facilities." 16 U.S.C. § 1454(b)(8) (emphasis added). A quid pro quo for the state's development of such a plan is that certain federal activities will be conducted consistently with the state's plan. 16 U.S.C. § 1456(c).
 
 
 30
 Thus, a major purpose of the CZMA is to avoid conflict and encourage cooperation between the federal and state governments in developing a comprehensive plan for long-term management of the resources in the coastal zone. 16 U.S.C. §§ 1451, 1452. To effectuate this purpose, the state must be permitted to become involved at an early stage of a significant and comprehensive activity, such as Lease Sale 53, that will eventually have an appreciable impact on the coastal zone. The narrow definition urged upon us by the federal appellants would preclude this early involvement.
 
 B. Legislative History
 
 31
 Our approach is not inconsistent with the legislative history of the CZMA. Although, as the district court pointed out, the legislative history of this Act is "inconclusive," 520 F.Supp. at 1371, it does lend support, when considered as a whole, to our approach.
 
 
 32
 In 1972, the Conference Committee substituted the phrase "directly affecting the coastal zone" for "in the coastal zone," in an apparent attempt to expand the scope of the provision. See id. No clue is given in 1972 as to how "directly" was to be interpreted. In 1976, in conjunction with amendments to CZMA sections other than 307(c)(1), the Senate Report noted:
 
 
 33
 There is very little coordination or communication between Federal agencies and the affected coastal States prior to major energy resource development decisions, such as the decision to lease large tracts of the OCS for oil and gas.
 
 
 34
 ... Full implementation of the Coastal Zone Management Act of 1972 ... could go far to institute the broad objectives of Federal-State cooperative planning envisioned by the framers of the act.
 
 
 35
 S.Rep. No. 277, 94th Cong., 2d Sess. 3, reprinted in 1976 U.S.Code Cong. & Ad.News, 1768, 1770.
 
 
 36
 In the Coastal Zone Management Improvement Act of 1980, Pub.L. No. 96-464, 94 Stat. 2060 (1980), Congress did not amend the section 307(c)(1) consistency provisions, but the reports of both the Senate and House Committees support a broad interpretation of "directly affecting." See 520 F.Supp. at 1372-73. The Senate report stated that:
 
 
 37
 intergovernmental coordination for purposes of OCS development commences at the earliest practicable time in the opinion of the Committee, as the Department of the Interior sets in motion a series of events which have consequences in the coastal zone.
 
 
 38
 S.Rep. No. 783, 96th Cong., 2d Sess. 11 (1980). (Emphasis added). The House Committee specifically addressed the uncertainty that had arisen concerning the interpretation of the threshold test of "directly affecting" the coastal zone. H.R.Rep. No. 1012, 96th Cong., 2d Sess. 34-35, reprinted in 1980 U.S.Code Cong. & Ad.News 4382-83. The Committee offered two alternative definitions of the phrase "directly affecting:" (1) The threshold test applies "whenever a Federal activity (has) a functional interrelationship from an economic, geographic or social standpoint with a State coastal program's land or water use policies." Id. at 34, reprinted in 1980 U.S.Code Cong. & Ad.News at 4382. (2) The Federal consistency requirements should apply "when a Federal agency initiates a series of events of coastal management consequence." Id. The House indicated its support of an "expansive interpretation of the threshold test," id. at 35, reprinted in 1980U.S.Code Cong. & Ad.News at 4383, and reiterated the Senate's statement that consultation between federal and state agencies should occur "at the earliest practicable time." Id. at 34, U.S.Code Cong. & Ad.News at 4382; see also S.Rep. No. 783, supra.
 
 
 39
 We recognize that these post-enactment committee statements might not represent a view adopted by Congress after full deliberation and, in any event, are not conclusive. However, these statements must be given appropriate weight. See Andrus v. Shell Oil Co., 446 U.S. 657, 666 n.8, 100 S.Ct. 1932, 1938 n.8, 64 L.Ed.2d 593 (1980); Walt Disney Productions v. United States, 480 F.2d 66, 68 (9th Cir. 1973), cert. denied, 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). In the circumstances of this case we accord them substantial weight because they appear to us to serve better the purposes of the CZMA than would the narrower interpretation urged by the federal appellants.
 
 
 40
 C. National Oceanic and Atmospheric Administration's Interpretation.
 
 
 41
 Our approach does no violence to our obligation to pay deference to the appropriate agency's interpretation of section 307(c)(1). The National Oceanic and Atmospheric Administration (NOAA) is the agency within the Department of Commerce charged with the responsibility of promulgating regulations for the CZMA. American Petroleum Institute v. Knecht, 456 F.Supp. 889, 908 (C.D.Cal.1978), aff'd, 609 F.2d 1306 (9th Cir. 1979). Its current view of the definition of "directly affecting" is unclear.
 
 
 42
 Until May 1981, NOAA consistently took the position that pre-leasing activities were subject to consistency review, and favored a broad interpretation of "directly affecting." See Watt v. California, supra, 520 F.Supp. at 1376-77. In 1978, NOAA stated that section 307(c)(1) was intended to apply to "all Federal actions which were capable of significantly affecting the coastal zone." 43 Fed.Reg. 10,510-11 (1978) (emphasis added). Although NOAA deleted this definition in 1979 in response to a Department of Justice opinion taking issue with that portion of the definition, 44 Fed.Reg. 37,142 (1979), it reiterated the view that "Federal agencies are encouraged to construe liberally the 'directly affecting' test in borderline cases so as to favor inclusion of Federal activities subject to consistency review." 44 Fed.Reg. 37,146-47 (1979). Along the same lines in 1980, NOAA noted:
 
 
 43
 In our view Federal consistency requirements subject final notices of OCS sales to consistency determinations. This critical decision point in the OCS process influences tracts to be selected and stipulations to be imposed and thus sets in motion actions which will invariably affect coastal resources.
 
 
 44
 Letter from NOAA to State Coastal Management Program Directors (April 9, 1980) (emphasis added).
 
 
 45
 In May 1981, shortly after complaints were filed in the present case, NOAA filed a notice of proposed rulemaking defining "directly affecting" in a way more nearly consistent with, if not identical to, that urged on us by the appellants. 46 Fed.Reg. 26,658-59 (1981). According to the definition, a federal activity directly affects the coastal zone only:
 
 
 46
 if the Federal agency finds that the conduct of the activity itself produces a measurable physical alteration in the coastal zone or that the activity initiates a chain of events reasonably certain to result in such alteration, without further required agency approval.
 
 
 47
 Id. (emphasis added). In the comments to this notice, NOAA listed lease issuance as an example of an activity that would not be subject to a consistency determination because it does not directly affect the coastal zone. Id. at 26,660. On July 2, 1981, NOAA issued its notice of final rulemaking. In late July and early August, however, resolutions were introduced in both houses of Congress disapproving the new regulations. Cf. 16 U.S.C. § 1463a. After the district court decision in this case, and following a vote by the House Merchant Marine and Fisheries Committee to disapprove the regulations on October 16, 1981, NOAA suspended the effective date of the regulations and moved to withdraw them, explicitly acknowledging the negative reaction it had received from both Congress and the coastal states. 46 Fed.Reg. 50,937, 50,976 (1981).
 
 
 48
 An agency's interpretation of a statute, while not having the force of law, is entitled to deference if we can conclude that the regulation "implement(s) the congressional mandate in some reasonable manner." United States v. Vogel Fertilizer Co., --- U.S. ----, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982), quoting United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967); Bureau of Alcohol, Tobacco and Firearms v. FLRA, 672 F.2d 732, at 734-735 (9th Cir. 1982). This general principle of deference, while fundamental, only sets the framework for judicial analysis, United States v. Vogel Fertilizer Co., supra, 102 S.Ct. at 827, quoting United States v. Cartwright, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), and poses no obstacle in this case to our rejection of appellants' approach.
 
 
 49
 As indicated, NOAA's short-lived narrow definition of "directly affecting" was first proposed during the pendency of this litigation, was specifically disapproved by some members and at least one Committee of Congress, was contrary to NOAA's longstanding position on the matter, and may not reflect NOAA's present view. To defer to such a passing phase in the appropriate agency's interpretation would amount to obeisance to shadows and a flight from judicial responsibility. On the other hand, we acknowledge that NOAA's earlier view that "directly affecting" should be liberally construed provides support to our holding that Lease Sale 53 must be accompanied by a section 307(c)(1) consistency determination.
 
 
 50
 D. Consistency with Outer Continental Shelf Lands Act
 
 
 51
 The federal appellants also claim that a definition of "directly affecting," other than one substantially similar to NOAA's aborted narrow view, is inconsistent with section 19 of the OCSLA. This section provides for Department of Interior consideration of state governors' recommendations regarding "size, timing, or location" of lease sales. We acknowledge, as we must, that federal statutes should be construed in a consistent and harmonious manner. Only in this way can congressional intent be given its fullest expression. Get Oil Out! Inc. v. Exxon Corp., 586 F.2d 726, 729 (9th Cir. 1978).
 
 
 52
 We find no conflict between our holding with respect to the scope of "directly affecting" as applicable to the facts of this case and the functions and purposes of the OCSLA. The CZMA and the OCSLA focus on different concerns-the OCSLA on development of oil and gas resources, and the CZMA on environmental concerns. American Petroleum Institute v. Knecht, supra, 456 F.Supp. at 919. They impose on the federal government separate obligations owing to different parties, and are capable of co-existence. Their consistency is further supported by the "savings clause" in the OCSLA, which expressly provides: "(N)othing in this Act shall be construed to modify, or repeal any provision in the Coastal Zone Management Act of 1972." 43 U.S.C. § 1866. We, therefore, conclude that Lease Sale 53 cannot proceed until the Secretary of Interior makes a determination that the proposed lease is consistent, to the maximum extent practicable, with the California coastal zone management plan.
 
 
 53
 E. Placement of Final Authority to Determine That the OCS Lease Sale 53 is Consistent to the Maximum Extent Practicable
 
 
 54
 To hold that the Secretary of Interior is required by CZMA § 307(c)(1) to make a consistency determination before going ahead with Lease Sale 53 unavoidably raises additional issues. Foremost among these is whether consistency to the maximum extent practicable of the federal activity with the approved state management program means simply conformity to the program in the manner deemed appropriate by the state concerned. The federal appellants insist that the district court, in effect, so held by enjoining the lease sale "until such time as defendants comply with the requirements of the Coastal Zone Management Act by conducting a consistency determination on the tracts at issue and by conducting all activities on these tracts in a manner consistent with California's Coastal Management Plan." 520 F.Supp. at 1389.
 
 
 55
 Assuming arguendo that the district court did so hold, we here reject that interpretation of the CZMA. The statute does not provide that a state's plan takes precedence when it would preclude the federal activity, or even that the federal activity must be as consistent with the plan as is possible. It only provides that the activity be consistent to the maximum extent practicable. The Act is not explicit with respect to the location of final authority to determine whether the required consistency exists. We believe such authority must reside in the Executive Branch of the federal government subject, of course, to such judicial review as is appropriate. To hold otherwise on the basis of silence, or at best attenuated inferences drawn from the language of Congress, weighs too lightly the interests of the Nation against that of a state.
 
 
 56
 Our conclusion is supported by the language and structure of both the CZMA and the OCSLA, as well as the history of events leading to the enactment of the OCSLA.
 
 
 57
 1. CZMA.
 
 
 58
 With respect to any plan for the exploration, development, and production stages, section 307(c)(3) of the CZMA sets out an elaborate procedure for dealing with disagreements between a coastal state and an applicant for a federal license or permit to conduct an activity affecting the coastal zone concerning the consistency of the federal activities and the state's management program. Under this section, to obtain a federal license or permit the state must certify that the activity is consistent unless the Secretary of Commerce properly finds that the activity "is consistent with the objectives of this chapter or is otherwise necessary in the interest of national security". 16 U.S.C. § 1456(c)(3)(A)-(B) (emphasis added). This provision clearly precludes an irreversible state veto of OCS activity at the exploration, development, and production stages. The Secretary of Commerce is given the final say as to whether the activity is consistent with the objectives of the CZMA, and if not, whether it is otherwise necessary in the interest of national security. It would be anomalous for Congress to have provided the state with final authority unilaterally to nip these activities in the bud, by reason of the application of section 307(c)(1) to lease sales, in the face of its careful scheme in section 307(c)(3) to assure that a state cannot unilaterally stop the activity at later stages. We do not think it intended to so provide.
 
 
 59
 2. OCS History and the OCSLA.
 
 
 60
 The history of the dispute concerning offshore resources supports our conclusion that a conclusive state veto was never intended over OCS oil and gas development. In 1953, to settle the long-standing dispute between the federal government and coastal states concerning control over offshore areas, Congress enacted the Submerged Lands Act, 43 U.S.C. §§ 1301-43. This "1953 Compromise" of the so-called Tidelands Oil Issue granted coastal states "title to and ownership of" submerged lands within three miles of the coast, the area referred to as the "coastal zone." 43 U.S.C. §§ 1301(a), 1311(a). The federal government was given exclusive proprietary control over "the soil and seabed of the Continental Shelf" outside this three-mile zone. 43 U.S.C. §§ 1302, 1332(a). The CZMA was not intended to change this division of control. Section 307(e) of the CZMA provides that:
 
 
 61
 Nothing in this title shall be construed-
 
 
 62
 (1) to diminish either Federal or state jurisdiction, responsibility, or rights in the field of planning, development, or control of water resources, submerged lands, or navigable waters.
 
 
 63
 16 U.S.C. § 1456(e). See also, H.R.Conf.Rep. No. 1544, 92d Cong., 2d Sess. 7, 12 (1972).
 
 
 64
 Granting final veto power to coastal states would thwart the purposes of the OCSLA. As the Supreme Court has recently stated, "Congress primarily was concerned in enacting OCSLA to assure federal control over the Shelf and its resources." Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 101 S.Ct. 2870, 2877, 69 L.Ed.2d 784 (1981). In 1978, in response to concern over increased dependence on foreign oil, the OCSLA was amended to:
 
 
 65
 establish policies and procedures for managing the oil and natural gas resources of the (OCS) which are intended to result in expedited exploration and development of the (OCS) in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade.
 
 
 66
 43 U.S.C. § 1802(1). These are vitally important goals for the well-being of the country, and the ultimate management authority over their achievement is vested in the federal government and not a particular coastal state.
 
 
 67
 Section 19 of the OCSLA, 43 U.S.C. § 1345, it is true, instructs the Secretary of Interior to consider recommendations by the Governor of an affected state regarding the size, timing, or location of a proposed lease sale. 43 U.S.C. § 1345(a). The section gives great weight to the Governor's recommendations, providing that the Secretary of Interior "shall accept" them if they provide a reasonable balance between the national interest and the well-being of the citizens of the state. Nevertheless, it is explicitly provided that the Secretary's decision to reject such recommendation is final, unless his decision is arbitrary or capricious. 43 U.S.C. § 1345(c), (d). The finality of the Secretary of Interior's decision under this section is another strong indication that the federal government is intended to have the ultimate authority over the OCS leasing program.
 
 
 68
 We, therefore, interpret section 307 (c)(1) to require that Lease Sale 53 be made consistent with California's plan to the maximum extent practicable. Accommodation to California's plan to a lesser extent does not afford consistency to the maximum extent practicable. Accommodation to a greater extent exceeds the command of the statute. In making this consistency determination, the Secretary of Interior may take into account that further consistency determinations will be made at the exploration, development, and production stages, when more complete information will be available. See 16 U.S.C. § 1456(c)(3). In other words, the lease sale need not be configured so as to preclude any possible future inconsistency from arising as development proceeds. The Secretary of Interior, however, must set the leasing, development, and production activities on a path that is consistent with the state plan to the maximum extent practicable in light of the then available knowledge.
 
 
 69
 The limit beyond which conformity with a state plan would not be practicable to the maximum extent cannot be precisely delineated. Such factors as the extent to which leasing, exploration, development, drilling, and production would be hampered or proscribed by conformity; the reasonableness of the state plan; as well as the terms of the particular proposed lease sale must be examined. Beyond this it is difficult to go; verbal formulas cannot eliminate the necessity of examining each situation with care and sensitivity to the concerns of the state and the nation.
 
 
 70
 3. Settlement of Disputes as to Consistency by Secretary of Commerce.
 
 
 71
 Inasmuch as the Secretary of Interior has not yet made the consistency determination that we hold he must with respect to Lease Sale 53, it is not possible to know whether the Secretary of Interior and the State of California will disagree on whether the required consistency determination reflects consistency "to the maximum extent practicable." In making the consistency determination, the Secretary of Interior undoubtedly will be guided by a spirit of federal/state cooperation. Should the state disagree with the Secretary's consistency determination, sections 307(c) and (h) contain mediation procedures that may be invoked by the Secretary of Commerce to reconcile the paramountcy of the national interest with the concerns of the state. We do not regard subsection (c)(1) of section 307 as lacking, or existing independently of, those procedures explicitly set forth in subsections (c)(3) and (h).
 
 F. Remedy
 
 72
 As already indicated, the district court's order required the federal appellants to conduct "all activities on (the tracts at issue) in a manner consistent with California's Coastal Management Plan." 520 F.Supp. at 1389. The premise on which this order rests appears to be that California's view of consistency ultimately will be controlling. We do not agree with this premise. We, therefore, affirm only that portion of paragraph 5 of the district court's order that requires a consistency determination to be made before Lease Sale 53 goes forward. That is, paragraph 5 is affirmed insofar as it reads:
 
 
 73
 Defendants and defendant-intervenors, their officers, agents, employees, representatives, and all persons acting in concert with them, are hereby enjoined from awarding, approving or taking any action or allowing others to take any action pursuant to any leases for any of the tracts at issue, until such time as defendants comply with the requirements of the Coastal Zone Management Act by conducting a consistency determination on the tracts at issue ....
 
 
 74
 We modify that paragraph to delete the remainder, which provides as follows: "and by conducting all activities on these tracts in a manner consistent with California's Coastal Management Plan." If the State does not agree with a determination of consistency by the Secretary of Interior, the dispute-resolution procedures of the CZMA are available.[2]
 
 
 75
 The district court also voided the bids for the tracts at issue and ordered the deposits returned to the bidders. Id. The federal appellants and oil companies argue that the cancellation of bids after their contents have been revealed is excessive, punitive, unprecedented, and destroys the essence of secret bidding procedures, thus causing the loss of millions of dollars the bidders spent compiling the data for the bids.[3] They argue that such drastic measures should be deferred at least until it is finally decided whether Lease Sale 53 can go forward in its present form. We agree. The resolution of the dispute must await a consistency determination by the Secretary of Interior. If the state does not agree with this determination, final resolution of the conflict must await the outcome of the CZMA dispute resolution procedures. During the pendency of these procedures, the status quo should be maintained. Therefore, we stay the portion of the district court's order (i.e., paragraphs 3 and 4) requiring the cancellation of the bids and return of the deposits and that portion of paragraph 5 of the order which required that federal lease sale activities be conducted consistently with California's coastal zone management plan.
 
 
 76
 To the extent that the deleted portion of paragraph 5 also requires that all other activities, including exploration, development, or production, be conducted consistently with California's plan, it embraces activities and stages of off-shore oil development not at issue in this case. Only the lease sale is at issue. We therefore vacate the district court's order insofar as it extends beyond the lease sale stage.
 
 
 77
 Finally, we retain jurisdiction over this appeal, and if the consistency determination process is not completed within a reasonable time we will entertain a motion to vacate our stay.
 
 
 78
 On the CZMA issue, therefore, we hold as follows:
 
 
 79
 (1) We affirm the district court's order insofar as it requires a consistency determination for Lease Sale 53.
 
 
 80
 (2) We stay the district court's order insofar as it declares bids and leases null and void and requires return of monies posted and insofar as it requires federal lease sale activities to be conducted consistently with California's coastal zone management plan.
 
 
 81
 (3) We vacate the district court's order insofar as it applies beyond the lease sale stage.
 
 V.
 NATIONAL ENVIRONMENTAL POLICY ACT
 
 82
 California also sought to enjoin the lease sale on the basis of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 et seq. It contends that the federal government's failure to supplement the Environmental Impact Statement (EIS) to incorporate the latest estimates of oil and gas reserves in the basin was a violation of section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). That section requires that an EIS be prepared and circulated for major federal actions affecting the quality of the human environment.
 
 
 83
 The Bureau of Land Management (BLM) released the final EIS on Lease Sale No. 53 in early September, 1980, incorporating the original estimates of oil and gas reserves provided by the United States Geological Survey (USGS). A few days before the release of the EIS, on August 28, 1980, the USGS released revised estimates of the oil and gas reserves. These new figures indicated that the reserves were thought to be roughly twice those originally estimated. Although the BLM did not alter the body of the EIS to reflect the new figures, it did attach the new estimates to the EIS as an Addendum. Also, a Secretary Issue Document (SID) was prepared for the Secretary of Interior in October, 1980, containing revised estimates of the environmental impacts using the new data. It was concluded in the SID, which is a public document, that a supplement to the EIS was not needed.
 
 
 84
 The district court granted summary judgment to the federal government on this issue, holding that:
 
 
 85
 the decision of the Department of Interior not to file a supplement or to revise the existing EIS in the few days remaining before publication is not unreasonable.
 
 
 86
 520 F.Supp. at 1383. We affirm.
 
 
 87
 The district court in its analysis focused on the adequacy of the initial EIS. 520 F.Supp. at 1382, quoting Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585, 592 (9th Cir. 1981). While we agree that the initial EIS was adequate, new information may require its supplementation. Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017 (9th Cir. 1980). A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions, even after release of an EIS. Id. at 1023-24. Guidelines of the Council on Environmental Quality require that agencies:
 
 
 88
 (1) Shall prepare supplements to either draft or final environmental impact statements if:
 
 
 89
 (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.
 
 
 90
 40 C.F.R. § 1502.9(c).
 
 
 91
 An agency's decision not to supplement an EIS will be upheld if it was reasonable. Warm Springs Dam, supra, at 1024. Reasonableness depends on the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data. Id. We hold that the decision of the BLM not to supplement the EIS for Lease Sale 53 was not unreasonable.
 
 
 92
 Whether the revisions to the estimates of oil reserves will change the environmental impact of Lease Sale 53 significantly is problematic. The accuracy of the data is open to question, given the inherently speculative nature of oil reserve estimates. Also, the qualitative impacts on the environment possibly could be the same under either set of estimates. In fact, in the SID only a small quantitative increase in impact was estimated. We acknowledge being influenced by the fact that additional Environmental Impact Statements will be required at the later exploration, production, and development stages, and these will, of course, be based on the latest reserve estimates available at the time they are prepared.
 
 
 93
 The revised estimates of oil and gas reserves were made available to the public as an addendum to the EIS, and environmental impact estimates using the new data were made public in the SID. While a SID cannot substitute for a supplemental EIS, in this case it supports a holding that the Department of Interior carefully considered the information and its impact before concluding that a supplementary EIS was unnecessary. The SID also provides a detailed explanation for the Secretary of Interior's decision not to supplement. While the Addendum and SID did not go through the public comment process, that process is not essential every time new information comes to light after an EIS is prepared. Were we to hold otherwise, the threshold decision not to supplement an EIS would become as burdensome as preparing the supplemental EIS itself, and the continuing duty to gather and evaluate new information, Warm Springs Dam, supra, at 1023, could prolong NEPA review beyond reasonable limits.
 
 
 94
 The district court did not err in its conclusion with respect to the NEPA issue.
 
 VI.
 OUTER CONTINENTAL SHELF LANDS ACT
 
 95
 Section 19 of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1345, provides, as already noted, that the governor of an affected state may submit recommendations to the Secretary of Interior regarding the size, timing, or location of a proposed lease sale. 43 U.S.C. § 1345(a). The Secretary is required to accept the governor's recommendations "if he determines ... that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." 43 U.S.C. § 1345(c). The statute provides that the Secretary's acceptance or rejection of such recommendations shall be final, "unless found to be arbitrary or capricious." 43 U.S.C. § 1345(d). See, e.g., Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 541 F.2d 1 (D.C.Cir.1976).
 
 
 96
 California claims that Governor Brown's recommendations provided for a reasonable balance between national and state interests, and thus that the Secretary's failure to accept the Governor's recommendations was arbitrary and capricious. California also contends that the Secretary violated certain procedural requirements of Section 19.
 
 
 97
 As the district court properly noted, the scope of our review is limited. In determining whether the Secretary's rejection of the Governor's recommendations was arbitrary or capricious, we must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), quoted in Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); Washington State Farm Bureau v. Marshall, 625 F.2d 296, 302 (9th Cir. 1980). Additionally, we must consider whether the Secretary "articulate(d) a rational connection between the facts found and the choice made," Bowman Transportation, Inc., supra, 419 U.S. at 285, 95 S.Ct. at 441, and whether the Secretary made the decision in accordance with his duty under law. American Petroleum Institute v. Knecht, 456 F.Supp. 889, 904-05, aff'd, 609 F.2d 1306 (9th Cir. 1979). The court may not substitute its judgment for that of the agency.
 
 
 98
 The district court, while not impressed with the spirit with which the Secretary dealt with the Section 19 requirements, held that, giving due deference to his judgment, the Secretary's decision to reject Governor Brown's recommendations was not legally "arbitrary and capricious." 520 F.Supp. 1385-86. We agree.
 
 
 99
 The Secretary did analyze factors weighing in the balance of interests, and described this analysis in a letter mailed to Governor Brown on May 1, 1981. As the district court noted, the OCSLA provides little or no guidance as to the proper basis for the Secretary's evaluation of a governor's recommendation. It provides that the Secretary must determine whether the governor's recommendation draws a "reasonable balance" between two key factors-the "national interest" and the "well-being of the citizens of the affected State." 43 U.S.C. § 1345(c). The statute requires that the determination of the "national interest" encompass "the desirability of obtaining oil and gas supplies in a balanced manner," but does not attempt to define the factors relevant to the citizens' well-being. Id.
 
 
 100
 The Secretary evaluated such "quantifiable factors" as income from resource development and expected monetary losses due to oil spills, and such "not quantifiable" factors as damage to wildlife, decline in water quality, and "aesthetic and lifestyle losses." 520 F.Supp. 1384. We agree with the district court that the Secretary gave some consideration to the relevant factors and his decision cannot be said to be arbitrary or capricious.
 
 
 101
 California also claims that the Secretary failed to comply with the procedural requirements of section 19 by not providing sufficient opportunity for the Governor to consult and by not adequately communicating to the Governor in writing his reasons for rejecting the recommendation. 43 U.S.C. § 1345(c).
 
 
 102
 The statute requires that the Secretary in making the decision to accept or reject the recommendation provide the Governor "the opportunity for consultation." 43 U.S.C. § 1345(c) (emphasis added). We agree with the district court that the Secretary's consultation with Governor Brown was adequate to meet the technical requirements of the statute. 520 F.Supp. 1385. The statute also requires the Secretary to "communicate to the Governor, in writing, the reasons for his determination to accept or reject such Governor's recommendations." 43 U.S.C. § 1345(c). We also agree with the court below that the Secretary's explanatory letter to the Governor satisfied this requirement, and that the timing of the letter-after announcement of his decision to go ahead with the lease sale and two days after suit was filed on this matter in district court-does not render it ineffective in fulfilling the statutory requirement. 520 F.Supp. 1385.
 
 
 103
 Having concluded that the Secretary complied with the procedural requirements of Section 19 of the OCSLA and that his decision to reject Governor Brown's recommendation was not arbitrary or capricious, we affirm the district court's grant of summary judgment to appellants on this issue.
 
 VII.
 STANDING OF ENVIRONMENTAL GROUPS
 
 104
 The Natural Resources Defense Council, Inc., The Environmental Defense Fund, and various other environmental organizations sought standing to raise the CZMA issues raised by the State of California and the local governments. The district court denied them standing because the CZMA was not enacted for their "especial benefit," and treated the briefs of these parties as amici curiae.[4] Citing two recent Supreme Court cases, Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); and California v. Sierra Club, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the district judge held that these environmental groups had no implied right of action to bring claims under the CZMA. Assuming, arguendo, this holding is correct, it does not resolve the standing issue.
 
 
 105
 The environmental groups rely for standing not on an implied right of action under the CZMA, but on Section 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 702. Addressing this point, the district court held that they may not rely on the APA as the sole jurisdictional predicate. In this the district court erred. The environmental groups relied on the APA for standing, not for federal subject matter jurisdiction. We hold that the environmental groups have standing under 5 U.S.C. § 702. No remand is necessary, however, because the erroneous denial of standing did not affect the outcome of the case.
 
 
 106
 We first note that federal court jurisdiction is based on 28 U.S.C. § 1331, for civil actions arising under the laws of the United States, and is not at issue in this case. Second, an implied right of action under the statute violated is not a necessary predicate to a right to action under the APA. Chrysler Corp. v. Brown, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979); Glacier Park Foundation v. Watt, 663 F.2d 882, 885 (9th Cir. 1981).
 
 
 107
 Section 10 of the APA, 5 U.S.C. § 702 provides:
 
 
 108
 A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.
 
 
 109
 To have standing under this section both of the following questions must be answered affirmatively:
 
 
 110
 1. Has the party seeking standing suffered a legal wrong, or been adversely affected or aggrieved by the agency action (i.e., has he been "injured in fact"), and,
 
 
 111
 2. Are the interests sought to be protected by the party seeking standing "arguably within the zone of interests to be protected or regulated" by the statute in question.
 
 
 112
 See Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 151-53, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Glacier Park Foundation v. Watt, supra, at 885.
 
 
 113
 A mere assertion of organizational interest in a problem, unaccompanied by allegations of actual injury to members of the organization, is not enough to establish standing. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1971); Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc., --- U.S. ----, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Here, however, actual injuries to members have been alleged. The environmental groups claim that various of their members live, work, and enjoy recreational activities in the areas that will be affected by leasing of OCS tracts. They allege that their members' use of the coast and waters for commercial and sport fishing, scientific research, tourist activities, and recreation is threatened by OCS leasing. Injuries of a noneconomic nature to widely-shared aesthetic and environmental interests, as well as economic injuries, can amount to sufficient "injury in fact" for standing under section 10. Sierra Club v. Morton, 405 U.S. at 734, 92 S.Ct. at 1365, cited with approval in United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Cady v. Morton, 527 F.2d 786 (9th Cir. 1975). Thus, the environmental groups' allegations establish sufficient "injury in fact" to permit an affirmative answer to the first question.
 
 
 114
 We also find that the alleged injuries are within the "zone of interests" to be protected by Section 307(c) of the CZMA. As already pointed out, section 307(c)(1) is part of a Congressional scheme to carry out the overall purpose of the CZMA, which is to protect the very resources the environmental groups claim are threatened. Congressional findings underlying the CZMA recognize "a national interest in the effective management (and) protection" of the coastal zone as well as in its development and beneficial use. Section 302(a), 16 U.S.C. § 1451(a). Congress expressed concern over the "loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use, and shoreline erosion" that has been "occasioned by population growth and economic development, including ... extraction of mineral resources and fossil fuels." 16 U.S.C. § 1451(c). We agree with the finding in American Petroleum Institute v. Knecht, 456 F.Supp. 889 (C.D.Cal.1978), aff'd, 609 F.2d 1306 (9th Cir. 1979), that "(a)lthough sensitive to balancing competing interests, (the CZMA) was first and foremost a statute directed to and solicitous of environmental concerns." 456 F.Supp. at 919. Thus, the allegations of the environmental groups permit an affirmative answer also to the second question.
 
 
 115
 The CZMA issues the environmental groups sought to raise were identical to those raised by the State of California and the local governments, parties who clearly had standing. Additionally, amici curiae briefs were filed by the parties wrongly denied standing. Our review of the more than one thousand pages of the eighteen briefs filed in this case, as well as the extensive argument and our own research, convince us that no stone was left unturned in presenting all aspects of the CZMA issue to this court. Allowing additional parties to present the same arguments would not affect the outcome of this case. Therefore, to remand the case for additional proceedings because of the district court's error with respect to standing would constitute a waste of scarce judicial resources.
 
 
 116
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND STAYED IN PART.
 
 
 
 [1]
 The district court order reads as follows:
 "ORDER AND SUMMARY JUDGMENT
 The parties' cross-motions for summary judgment, pursuant to Fed.R.Civ.P. 56, and defendant-intervenors' motion for summary judgment, or, in the alternative, motion to dismiss the complaints of Natural Resources Defense Council, et al., and of the County of Humboldt, et al., pursuant to Fed.R.Civ.P. 12(b)(6), came on for hearing before the Honorable Mariana R. Pfaelzer on July 10, 1981. All parties appeared by and through their respective counsel of record. Having reviewed and considered the administrative record and the memoranda, affidavits, and exhibits filed by the parties, and having heard and considered the oral arguments of counsel, and having taken the matter under submission, the Court has incorporated its Findings of Fact and Conclusions of Law in the Opinion filed herewith. Accordingly,
 IT IS ORDERED, ADJUDGED AND DECREED that:
 
 
 [1]
 Plaintiffs' Motion for Summary Judgment in CV 81-2080, with respect to the claim arising under the Coastal Zone Management Act, 16 U.S.C. §§ 1451 et seq., is granted. Defendants' Motion for Summary Judgment with respect to plaintiffs' claim arising under the Coastal Zone Management Act is denied
 
 
 [2]
 Defendants' decision to lease Tracts 129 to 142, 144 to 146, 148 to 155 and 158 to 161 in the northern portion of the Santa Maria Basin for oil and gas development was made in violation of the Coastal Zone Management Act
 
 
 [3]
 Any bids received for the tracts at issue are declared null and void and the monies posted shall be returned to the bidders
 
 
 [4]
 Any oil and gas leases for any of the tracts at issue herein awarded as part of Lease Sale No. 53 are declared null and void
 
 
 [5]
 Defendants and defendant-intervenors, their officers, agents, employees, representatives, and all persons acting in concert with them, are hereby enjoined from awarding, approving or taking any action or allowing others to take any action pursuant to any leases for any of the tracts at issue, until such time as defendants comply with the requirements of the Coastal Zone Management Act by conducting a consistency determination on the tracts at issue and by conducting all activities on these tracts in a manner consistent with California's Coastal Management Plan
 
 
 [6]
 Defendants' Motion for Summary Judgment in CV 81-2080 with respect to plaintiffs' claims arising under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et seq., the National Environmental Protection Act, 42 U.S.C. §§ 4321 et seq., the Endangered Species Act, 16 U.S.C. §§ 1531 et seq., and the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 et seq., is granted. Plaintiffs' Motion for Summary Judgment in CV 81-2080 with respect to the claims arising under these statutes is denied
 
 
 [7]
 Defendant-intervenors' Motion to Dismiss Plaintiffs, Natural Resources Defense Council, et al., in CV 81-2081 pursuant to Fed.R.Civ.P. 12(b)(6) is granted
 
 
 [8]
 Defendant-intervenors' Motion to Dismiss Plaintiff-intervenors County of Humboldt, et al., in CV 81-2080 pursuant to Fed.R.Civ.P. 12(b)(6) is denied
 
 
 [9]
 Each party shall bear its own costs
 
 
 [10]
 Judgment is hereby entered
 The Court shall retain continuing jurisdiction over this case to ensure compliance with this Order."
 California v. Watt, 520 F.Supp. 1359, 1389 (C.D.Cal.1981).
 
 
 [2]
 Appellants also object to the district court's failure to perform a "particularized analysis" of possible remedies and their consequences, as required by Alaska v. Andrus, 580 F.2d 465 (D.C.Cir.), vacated in part on other grounds, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978). Although this claim appears to have merit, we do not reach the issue of the applicability of Alaska v. Andrus, in view of our disposition on other grounds of the remedy ordered below
 
 
 [3]
 WOGA concedes that it suggested to the lower court the very remedy to which it now objects, but this does not affect our decision on this issue
 
 
 [4]
 The district court dismissed the environmental groups and their claims from the lawsuit in a separate order of dismissal. NRDC v. Watt, 520 F.Supp. 1359 (C.D.Cal.1981) (order of dismissal)