869 F.2d 1185
 19 Envtl. L. Rep. 20,071
 TRIBAL VILLAGE OF AKUTAN; Tribal Village of Togiak, a
federally recognized Tribe; The Tribal Village of Nelson
Lagoon, a federally recognized Tribe; Steve Cowper;
Governor of Alaska, et al., Plaintiffs-Appellants,
v.
Donald HODEL, Secretary of the Interior; and United States
Department of the Interior, Defendants-Appellees,
Amoco Production Company; ARCO Alaska, Inc.; Chevron USA,
Inc., et al.; International Association of
Geophysical Contractors,
Defendant-Intervenors/Appellees.
 Nos. 88-3610, 88-3703, 88-3729.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 4, 1988.
Decided Oct. 5, 1988.
As Amended on Denial of Rehearing and Rehearing En Banc March 9, 1989.
 
 Carol H. Daniel, Alaska Legal Services Corp., Eric Smith, Anchorage, Alaska, Gary I. Amendola, Asst. Atty. Gen., State of Alaska, for plaintiffs-appellants.
 Jacques B. Gelin, Atty., Land & Natural Resources Div., U.S. Dept. of Justice, for defendants-appellees.
 E. Edward Bruce, Covington & Burling, Washington, D.C., Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, Alaska, Nathan S. Bergerbest, Doyle & Savit, Washington, D.C., Cathy Dobbs, Dobbs, Berger, Molinari, Casalnuovo, Vannelli & Nadel, San Francisco, Cal., for intervenors-appellees.
 John A. Saurenman, Deputy Atty. Gen., State of Cal., Kathleen A. Weeks, Pacific Legal Foundation, Sacramento, Cal., for amici.
 Appeal from the United States District Court for the District of Alaska.
 Before TANG, KOZINSKI and THOMPSON, Circuit Judges.
 KOZINSKI, Circuit Judge:
 
 
 1
 The Tribal Village of Akutan and two other tribal villages, the Trustees for Alaska and twelve other environmental organizations, and the State of Alaska and seven organizations concerned with the preservation of Alaska's fisheries (Alaska), appeal the district court's grant of summary judgment in favor of the Secretary of the Interior, the Department of the Interior, the National Marine Fisheries Service and nineteen intervenors (Secretary). Appellants have sued to enjoin the Secretary from conducting Lease Sale 92 in the North Aleutian Basin (also referred to as Bristol Bay) on the grounds that the Secretary has failed to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321-4361 (1982 & Supp. IV 1986), the Endangered Species Act, (ESA), 16 U.S.C. Secs. 1531-1543 (1982 & Supp. IV 1986), and the Outer Continental Shelf Lands Act, (OCSLA) 43 U.S.C. Secs. 1331-1356 (1982 & Supp. III 1985).
 
 I. Facts
 
 2
 The development and operation of offshore oil wells is controlled by OCSLA, which establishes a national policy of making the outer continental shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. Sec. 1332(3). The Act establishes four distinct stages in the administrative process: (1) formulation of a five-year leasing plan by the Secretary; (2) lease sales; (3) exploration by the lessees; and (4) development and production. Secretary of the Interior v. California, 464 U.S. 312, 337, 104 S.Ct. 656, 669, 78 L.Ed.2d 496 (1984); Village of False Pass v. Clark, 733 F.2d 605, 608 (9th Cir.1984). "Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS [outer continental shelf]." Secretary of the Interior v. California, 464 U.S. at 337, 104 S.Ct. at 669.
 
 
 3
 During the first stage of OCSLA, the Secretary prepares a Five-Year OCS Oil and Gas Lease-Sale Schedule. 43 U.S.C. Sec. 1344. The Secretary must request comments from federal agencies and governors of affected states before submitting the proposed program of lease sales to the President and Congress. Id. at Sec. 1344(c)-(d).
 
 
 4
 In the second stage, the Secretary conducts lease sales of tracts on the outer continental shelf. Before soliciting bids and awarding leases, the Secretary must comply with a detailed combination of investigating, consulting and reporting requirements. Most significantly, the Secretary's review of environmental consequences must meet both NEPA standards, Village of False Pass, 733 F.2d at 609 (interpreting 43 U.S.C. Sec. 1346(a)(1)), and ESA requirements, id. (while not mentioned in OCSLA, ESA "applies of its own force and effect"). Under OCSLA, the Secretary must also consult with the governor of any affected state, see, e.g., 43 U.S.C. Secs. 1344(b)(3), 1345(a), and accept the governor's recommendations if the Secretary believes they strike a reasonable balance between the national interest and the well-being of the citizens of the affected state. Id. at Sec. 1345(c).
 
 
 5
 After the lease sale has been completed, the highest qualified bidder is granted a lease which entitles him to conduct limited preliminary activities such as geophysical surveys. However, "by purchasing a lease, lessees acquire no right to do anything more. Under the plain language of OCSLA, the purchase of a lease entails no right to proceed with full exploration, development, or production ...; the lessee acquires only a priority in submitting plans to conduct these activities." Secretary of the Interior v. California, 464 U.S. at 339, 104 S.Ct. at 670.
 
 
 6
 Prior to embarking on the third stage of the OCSLA process--exploration of the lease sale area--a lessee must submit an exploration plan and an environmental report, which are subject to further review. There is yet another round of review before the lessor may enter into the final stage--development and production of oil. "If [the lessee's] plans, when ultimately submitted, are disapproved, no further exploration or development is permitted." Id. This four-level review process gives the Secretary a "continuing opportunity for making informed adjustments" to the process of developing offshore oil wells in order to ensure all activities are conducted in an environmentally sound manner. Village of False Pass, 733 F.2d at 616 (quoting Sierra Club v. Morton, 510 F.2d 813, 828 (5th Cir.1975)).
 
 
 7
 In November 1974, the Secretary began studying the possibility of leasing tracts for oil and gas production in the North Aleutian Basin off the southwest coast of Alaska. This region is important economically and ecologically. The fisheries of the North Aleutian Basin are "among the most productive in the world," Alaska Outer Continental Shelf Region, Minerals Management Service, U.S. Dep't of the Interior, 1 Final Environmental Impact Statement, North Aleutian Basin Sale 92 III-C-1 (1985) [hereinafter cited as FEIS], important both for commercial and sport fishing. The area is also the home of endangered species of marine mammals and birds. Eighty percent of the current eastern population of Pacific gray whales migrates through the Bristol Bay's Unimak Pass during the spring and fall.
 
 
 8
 After twice canceling plans for lease sales in the bay at Alaska's request, the Secretary submitted a five-year oil and gas leasing schedule in 1982 which proposed the lease sale of all 32.5 million acres of the North Aleutian Bay. This lease sale, denominated Lease Sale 92, was scheduled for April 1985. In March 1984, in response to concerns expressed by the Governor of Alaska, the Secretary restricted leasing to the southwest corner of the region by deleting nearly 83 percent of the acreage from the sale.
 
 
 9
 The Secretary then proceeded to follow the statutory prelease process: He solicited resource reports from federal and state agencies; solicited comments from the oil industry, governmental agencies, environmental groups and the general public; prepared both a draft and final environmental impact statement as required by NEPA; obtained biological opinions from the Fish and Wildlife Service and the National Marine Fisheries Service, as required by ESA; conducted public hearings; and consulted at length with the Governor of Alaska and other state officials.
 
 
 10
 In his formal recommendations to the Secretary, the Governor objected to the timing, size, location and terms of the proposed lease sale of the remaining 5.6 million acres. He requested a number of changes, including an additional eight-year delay in the sale and the deletion of all tracts within twenty-five miles of the Alaska Peninsula. Letter from Bill Sheffield, Governor, State of Alaska, to Donald Hodel, Secretary, Department of the Interior (November 5, 1985) at 2, Excerpts of Record (ER) at 33. The Secretary rejected both recommendations, see U.S. Dep't of the Interior, Statement of the Reasons for the Decision on Sale 92 (Dec.1985), ER at 35 [hereinafter cited as Statement of Reasons ], although he accepted the Governor's other mitigating measures. On December 16, 1985, the Secretary published a final notice of sale in the Federal Register. 50 Fed.Reg. 51372-80 (1985).
 
 
 11
 Litigation began later that month, as appellants filed three suits, later consolidated by the district court, to enjoin the Secretary from proceeding with Lease Sale 92. Appellants claimed the proposed sale violated OCSLA, NEPA, ESA and the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. Secs. 3101-3233 (1982 & Supp. IV 1986). Relying on our decision in Gambell v. Hodel, 774 F.2d 1414 (9th Cir.1985) [Gambell II ], rev'd in part, vacated in part sub nom. Amoco Production Co. v. Gambell, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the district court concluded that the Secretary had violated section 810 of ANILCA, 16 U.S.C. Sec. 3120, and that such a violation automatically entitled plaintiffs to injunctive relief.
 
 
 12
 Appellees immediately obtained a partial stay of the district court's preliminary injunction to prevent cancellation of the sale pending appeal. In Tribal Village of Akutan v. Hodel, 792 F.2d 1376 (9th Cir.1986), vacated, 480 U.S. 943, 107 S.Ct. 1598, 94 L.Ed.2d 785 (1987), we upheld the preliminary injunction as required by Gambell II. While a petition for certiorari in Akutan was pending in the Supreme Court, the Court reversed Gambell II, holding that section 810 of ANILCA, 16 U.S.C. Sec. 3120, establishing procedures to protect Alaskan natives' use of public lands, does not apply to land in the outer continental shelf; and that violations of the Act do not require an automatic injunction. Amoco Production Co., 480 U.S. 531, 107 S.Ct. 1396. The Court then granted certiorari in Akutan, and remanded to this court. 107 S.Ct. 1598 (1987). The Secretary did not seek to vacate the preliminary injunction but, instead, agreed to an expedited resolution of the remaining issues. We remanded to the district court, which granted summary judgment for the Secretary on all counts, but enjoined the lease sale pending appeal. We denied the Secretary's motion to vacate the injunction.
 
 
 13
 Appellants make three claims. First, they contend that the Secretary's rejection of the Governor's key recommendations to delay and limit the area of the sale was arbitrary and capricious, thus violating section 19 of OCSLA, 43 U.S.C. Sec. 1345. Second, they claim that the environmental impact statement prepared for Lease Sale 92 was so flawed by methodological and procedural errors that it did not satisfy the requirements of NEPA. Finally, they claim that the Secretary violated ESA by rejecting some of the reasonable and prudent alternatives recommended by the National Marine Fisheries Service (NMFS), and by relying on a biological opinion which was itself fundamentally flawed. We consider each claim in turn.
 
 
 14
 As the district court granted summary judgment on all these claims, we stand in the district judge's shoes in reviewing his decision: "[W]e may affirm a summary judgment only if, viewing the evidence in the light most favorable to the party against whom it is granted, we find no genuine issue of material fact, and we find that the prevailing party is clearly entitled to judgment as a matter of law." California v. Watt, 683 F.2d 1253, 1258 (9th Cir.1982) (citations omitted), rev'd on other grounds sub nom. Secretary of the Interior v. California, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).
 
 II. The OCSLA Claim
 
 15
 Section 19 of OCSLA, 43 U.S.C. Sec. 1345, entitles the governor of an affected state to submit recommendations "regarding the size, timing, or location of a proposed lease sale" to the Secretary. Id. at Sec. 1345(a). The Secretary must accept these recommendations "if he determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." Id. at Sec. 1345(c). Section 1345(d) provides that the Secretary's acceptance or rejection of the recommendations shall be final "unless found to be arbitrary or capricious."
 
 
 16
 As we noted in California v. Watt, the scope of our review is limited: "In determining whether the Secretary's rejection of the Governor's recommendations was arbitrary or capricious, we must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." 683 F.2d at 1268. The court must decide whether the Secretary "articulate[d] a rational connection between the facts found and the choice made," id. at 1269 (citing Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 440, 42 L.Ed.2d 447 (1974)), and "whether the Secretary made the decision in accordance with his duty under law," id. (citing American Petroleum Inst. v. Knecht, 456 F.Supp. 889, 904-05 (C.D.Cal.1978), aff'd, 609 F.2d 1306 (9th Cir.1979)).
 
 
 17
 Alaska contends that the district court made two errors in determining that the Secretary's rejection of the Governor's recommendations was not arbitrary or capricious. First, Alaska claims that the district court misinterpreted section 19 of OCSLA. Under Alaska's reading of the statute, if the governor has balanced the national interest and the well-being of the citizens of the state in an objectively reasonable way, the Secretary must defer to the governor's recommendations. A reviewing court should therefore determine whether the governor's recommendations fall within the range of reason, not whether the Secretary was arbitrary or capricious in rejecting them.
 
 
 18
 This analysis is in accord with neither the statutory language nor our precedents. The plain language of section 19 limits the court to reviewing the rationality of the Secretary's determination; the court cannot "substitute its judgment for that of the [Secretary]." California v. Watt, 683 F.2d at 1269 (dismissing a similar argument that the Secretary must accept the governor's recommendations if they "provided for a reasonable balance between national and state interests," id. at 1268). Even if we agreed that the Governor's recommendations were reasonable, we could not conclude the Secretary was arbitrary or capricious simply because he chose to reject them.
 
 
 19
 Alaska offers a second reason for reversing the Secretary's decision: It was made without due consideration of the Governor's recommendations and in reliance on flawed data. Alaska alleges the Secretary made a number of specific errors: He disregarded OCSLA's requirement to base the determination of national interest "on the desirability of obtaining oil and gas supplies in a balanced manner and on the findings, purposes, and policies of this subchapter" as required by section 19(c) of OCSLA, 43 U.S.C. Sec. 1345(c); he failed to make sufficient findings concerning the protection of fisheries; he relied on erroneous economic calculations in refusing to delay the sale at least eight more years; and he based his refusal to defer the sale of 137 near-shore tracts on a flawed oil spill risk analysis.
 
 
 20
 None of these contentions has merit. As the district court held, the Secretary adequately balanced the nation's interest in developing oil and gas supplies against its policy of protecting the environment, see Statement of Reasons at 2-35, and specifically discussed the importance of preserving the bay's fisheries. Id. at 17-20, 22-26. Contrary to appellants' suggestion, the Secretary carefully compared the costs and benefits of the proposed lease sale with those of the governor's plan. In making his cost-benefit analysis, the Secretary relied on experts' assessments of the net economic value of the lease sales and the probability and impact of oil spills. In attacking the accuracy of the experts' calculations, Alaska uncovers no fundamental flaws or irrationality; rather, Alaska only succeeds in showing it prefers the results reached by a different methodology.
 
 
 21
 Finally, Alaska argues that the Secretary did not give the Governor a meaningful opportunity to comment on the net economic value calculations used in planning Lease Sale 92. Although the Secretary formally solicited the Governor's comments on the original lease sale proposal, the Secretary did not resubmit the proposal to the Governor after making minor revisions in net economic value calculations. However, as the Governor had a fair opportunity to comment on the original lease sale proposal, which was not altered in any significant way, OCSLA does not require a second round of consultation.
 
 
 22
 Because the Secretary complied with the duties imposed by statute, and "articulate[d] a rational connection between the facts found and the choice made," California v. Watt, 683 F.2d at 1269, we agree with the district court that the Secretary's decision to reject the Governor's suggestions was not arbitrary or capricious.III. The NEPA Claim
 
 
 23
 NEPA is a procedural statute designed to "ensure that federal agencies are fully aware of the impact of their decisions on the environment." Oregon Envt'l Council v. Kunzman, 817 F.2d 484, 492 (9th Cir.1987). Section 102 of NEPA, 42 U.S.C. Sec. 4332, requires all agencies of the federal government to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on ... the environmental impact of the proposed action ... [and] alternatives to the proposed action." 42 U.S.C. Sec. 4332(2)(C)(i) and (iii). Before preparing an environmental impact statement, the responsible federal official "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. Sec. 4332(2)(C).
 
 
 24
 Our review of an environmental impact statement is governed by the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(D), which empowers a court to strike down agency actions taken "without observance of procedure required by law." Kunzman, 817 F.2d at 492. In applying this standard, the district court must determine whether the environmental impact statement contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences," and provides information which is reasonably sufficient to encourage informed public participation and to "enable the decisionmaker to consider the environmental factors and make a reasoned decision." Id. at 492-93 (citations omitted). A court may not strike down an environmental impact statement because of minor technical deficiencies. Id. Findings of fact underlying the district court's decision may not be overturned unless they are clearly erroneous, Northwest Indian Cemetery Protective Ass'n v. Peterson, 795 F.2d 688, 696 (9th Cir.1986), rev'd on other grounds, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), while the legal adequacy of an environmental impact statement is a question of law, which we review de novo. Id.
 
 
 25
 Appellants contend that the environmental impact statement prepared for Lease Sale 92 suffered from three fundamental errors, two methodological and one procedural. The alleged methodological errors infected the preparation of the oil spill risk analysis. First, appellants claim the Secretary's analysis was based on a significant underestimation of the amount of oil that might be spilled in the environmentally sensitive near-shore tracts. Because of this error, they argue, the Secretary was unable to make an accurate assessment of the benefits that would accrue from deleting these tracts from the lease sale area. Second, appellants allege that the analysis did not consider such variables as seasonal changes in the weather and the movement of seasonal fish and wildlife. Finally, appellants point to a procedural error: In failing to disclose all of the underlying assumptions on which the oil spill risk analysis was based, the Secretary violated his duty to "make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information." Trout Unlimited v. Morton, 509 F.2d 1276, 1282-83 (9th Cir.1974).
 
 
 26
 The Secretary vigorously contests these claims. He argues that the oil spill risk analysis was adequate given the inherently speculative character of such analyses at an early stage in the planning process; that there are serious methodological flaws in appellant's own methodology; and that, in any event, the difference between the Secretary's results and those of the appellants is statistically insignificant.
 
 
 27
 The question of whether the Secretary's analysis was adequate to meet the requirements of NEPA is largely disposed of by our reasoning in Village of False Pass v. Clark, 733 F.2d 605 (9th Cir.1984). In that case, appellants argued that the environmental impact statement prepared for a proposed lease sale of offshore drilling locations violated NEPA because it failed to consider a worst case scenario of a 100,000-barrel oil spill. Holding that such an analysis was unnecessary at the lease sale stage, we announced the general principle that the amount and specificity of information necessary to meet NEPA requirements varies at each of OCSLA's stages. This principle has been adopted by other circuits, see, e.g., Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1378 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); Sierra Club v. Morton, 510 F.2d 813, 828 (5th Cir.1975), and approved by the Supreme Court. Secretary of the Interior v. California, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).
 
 
 28
 We are the least troubled by what may seem to be incomplete or speculative data at the lease sale stage. Prior to exploration, it is difficult to make so much as an educated guess as to the volume of oil likely to be produced or the probable location of oil wells. Without this information, an oil spill risk analysis can never be more than speculative, regardless of what methodology is used. More accurate information will be available at later stages of the exploration process, and the Secretary can make appropriate alterations in the oil development plan at that time. Furthermore, any technical deficiencies at the lease sale stage are unlikely to result in environmental damage, as a lease sale "does not directly mandate further activity that would raise an oil spill problem," Village of False Pass, 733 F.2d at 616, citing Secretary of the Interior v. California, 464 U.S. at 317, 104 S.Ct. at 659. We reached a similar conclusion in California v. Watt, 683 F.2d at 1267, where we approved an environmental impact statement even though its oil spill risk analysis was based on a fifty percent underestimation of oil reserves. We noted that "additional Environmental Impact Statements will be required at the later exploration, production, and development stages, and these will, of course, be based on the latest reserve estimates available at the time they are prepared." Id. at 1268.
 
 
 29
 Under the standard applicable to the lease sale stage, we conclude that the Secretary's environmental impact statement for Lease Sale 92 was adequate to meet the requirements of NEPA. As the district court observed, the Secretary provided "a reasoned analysis of the evidence before [him]," Friends of Endangered Species v. Jantzen, 760 F.2d 976, 986 (9th Cir.1985), in compliance with the statutory procedure. We need not consider whether the oil spill risk analysis was in fact flawed by a deficiency in methodology; we need only consider whether use of the particular methodology employed in preparing the oil risk spill analysis is reasonable. As we previously stated, "NEPA does not require that we decide whether an [environmental impact statement] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements ... as to methodology." Kunzman, 817 F.2d at 496. The Secretary may refine his analysis based on information learned during later stages of exploration.
 
 
 30
 Appellants also make a procedural challenge, claiming that the Secretary violated NEPA by failing to provide the public with adequate information on oil spill risks. The Secretary contends that the twelve-page discussion of methodology in the environmental impact statement, 1 FEIS IV-A-8 to IV-A-19, adequately fulfilled his responsibilities. We agree. NEPA does not require the environmental impact statement to disclose all assumptions underlying a particular methodology, see, e.g., 40 C.F.R. Sec. 1502.24 (1987) (requiring an environmental impact statement to "identify any methodologies used," but making the discussion of such methodology optional). In light of the speculative nature of the oil spill risk analysis at the lease sale stage, the omission of information regarding the Secretary's selection of the number and location of oil spill points, and the amount of oil assumed to have spilled from each point, is immaterial.[1]
 
 IV. The ESA Claims
 
 31
 Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. Sec. 1536(a)(2), requires federal agencies, with the assistance of the Secretary, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species...." The federal agency undertaking such an activity must consult the service having jurisdiction over the relevant endangered species;[2] the service then issues a biological opinion that details how the proposed action "affects the species or its critical habitat," including the impact of "incidental takings" of the species.[3] If a species might be endangered by the agency action, the service suggests "reasonable and prudent alternatives" to the agency's proposal. Id. at Sec. 1536(b)(3)(A). The agency is not required to adopt the alternatives suggested in the biological opinion; however, "[i]f [the Secretary] deviates from them, he does so subject to the risk that he has not satisfied the standard of section 7(a)(2)." Village of False Pass v. Watt, 565 F.Supp. 1123, 1160-61 (D. Alaska 1983), aff'd, 733 F.2d 605 (9th Cir.1984).
 
 
 32
 Because ESA contains no internal standard of review, our review is governed by the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982). We may set aside the actions of the Secretary or the NMFS only if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Village of False Pass, 733 F.2d at 610. The Secretary need not justify his decisions by clear and convincing evidence, as the appellants erroneously claim. We review the district court's application of this standard de novo. Id.
 
 
 33
 Appellants contend that the Secretary failed to fulfill his responsibilities under section 7(a)(2) by rejecting one of the NMFS's "reasonable and prudent alternatives" for the protection of gray whales. In its biological opinion, the NMFS determined that a "major oilspill in the waters of the southeastern Bering Sea during peak migration periods of gray whales is likely to jeopardize the continued existence of the species." Nat'l Marine Fisheries Service, Nat'l Oceanic and Atmospheric Admin., U.S. Dep't of Commerce, Endangered Species Act Section 7 Consultation--Biological Opinion 13 (March 21, 1984) [hereinafter Biological Opinion ], reprinted in 2 FEIS at H-4. To "reduce the risk of oilspills to gray whales," the NMFS recommended adoption of the Minerals Management Service's recommendation "of leasing deferrals within a 50-mile radius of Unimak Pass and the Pribilof Islands, and within 25 miles of shore along the Alaska Peninsula." Biological Opinion at 20, reprinted in 2 FEIS at H-6. The Secretary did not fully adopt this proposal. While he deleted "virtually all tracts within 50 miles of Unimak Pass," he did not provide the full 25 mile offshore buffer zone advised by NMFS. Instead, he deleted all tracts within 11 miles of shore and adopted alternative measures he considered sufficient to prevent preliminary activities from endangering the whales. See Statement of Reasons 66-68, ER at 35; Minerals Management Service, U.S. Dep't of the Interior, Sale 92, North Aleutian Basin, Secretarial Issue Document (Aug.1985) at 24-28 [hereinafter SID].
 
 
 34
 The Secretary's departure from the suggestions in the biological opinion does not by itself constitute a violation of ESA; he satisfied section 7(a)(2) if he took alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species. We once again make this determination in light of OCSLA's multi-stage structure. As the D.C.Circuit noted in North Slope Borough v. Andrus, 642 F.2d 589, 609 (D.C.Cir.1980), "[m]andatory stage-by-stage review prevents the telescoping of any and every projected hazard to endangered life and to the environment into one overwhelming statutory obstacle.... By ensuring graduated compliance with environmental and endangered life standards, OCSLA makes ESA requirements more likely to be satisfied both in an ultimate and a proximate sense."
 
 
 35
 The Secretary's responsibilities are not identical at every step of the OCSLA process.
 
 
 36
 We must first determine, therefore, what actions ESA requires at the lease sale stage. We discussed this in depth in Village of False Pass v. Clark, where appellants raised an ESA challenge to the Secretary's proposed sale of oil leases in the St. George Basin of the Bering Sea, a refuge for rare gray and right whales. Because the NMFS had phrased its "reasonable and prudent alternatives" in general, rather than specific terms, the Secretary did not explicitly reject the service's recommendations. Appellants nevertheless contended that the Secretary had violated ESA by failing "to adopt 'concrete measures' at the lease sale stage, such as tract deletion or seasonal drilling restrictions, to protect gray and right whales under ESA from oil spills and seismic testing." 733 F.2d at 608. We disagreed. As "[t]he lease sale decision itself could not directly place gray or right whales in jeopardy," we concluded that concrete steps were not necessary, and "the Secretary could properly limit his action at the lease sale stage to a plan for later implementation." Id. at 611. In Village of False Pass, the Secretary's plan included an agreement with NMFS for further monitoring after the lease sale and the inclusion of special disclaimers in the Final Notice of Sale specifying the Secretary's "continuing control of any post-sale drilling." Id. We ruled that such a plan was legally adequate, so long as the Secretary recognized his continuing obligation to implement the plan and to take other steps necessary to fulfill his ESA responsibilities at each stage of the OCSLA process. Id.; see also Conner v. Burford, 848 F.2d 1441, 1455-56 (9th Cir.1988).
 
 
 37
 Applying the standards established by Village of False Pass to appellants' ESA claims, we conclude that the steps taken by the Secretary to comply with ESA requirements were adequate, and his decision to reject some of NMFS's "reasonable and prudent alternatives" was neither arbitrary nor capricious. We agree with the district court that the Secretary's explanation for declining to delete 250 miles of offshore tracts was well reasoned and supported by the record: The Secretary "pointed out that exploration-stage spills are most unlikely, that deletion of nearshore tracts would only marginally reduce the threat to endangered whales from such spills, and that seasonal or ad hoc drilling restrictions can provide adequate protection." Tribal Village of Akutan v. Hodel, No. A85-701 (consolidated with J85-37 & J85-38) (D. Alaska Mar. 11, 1988) (memorandum and order granting summary judgment to defendants on plaintiff's ESA and NEPA claims) at 3, ER at 17.
 
 
 38
 Instead of deleting all the offshore tracts recommended by NMFS, the Secretary adopted other mitigating measures, including several that had been approved in Village of False Pass v. Clark. For example, he agreed to consult informally with NMFS following the lease sale and to initiate formal consultations once the development and production stages began. He modified the Final Notice of Sale to inform lessees that the Secretary might limit or suspend drilling activities whenever migrating whales were near enough to be subject to the risk of oil spills. Finally, he minimized disturbances to the whales by requiring operators and lessees to post whale lookouts when conducting seismic tests. Statement of Reasons at 67. The district court observed that "[t]hese steps and the SID explanation appear to have satisfied NMFS's parent agency, NOAA [National Oceanic and Atmosphere Administration] ... for in its final ESA comments on the sale NOAA did not reiterate those recommendations." Tribal Village of Akutan v. Hodel, No. A85-701 at 2-3, ER at 17.
 
 
 39
 We once again note that the risks to endangered species during the lease sale stage are virtually nonexistent. Only limited preliminary activities are permitted during this stage, such as geological, geophysical and other surveys "which do not result in any physical penetration of the seabed of greater than 500 feet and which do not result in any significant adverse impact on the natural resources of the Outer Continental Shelf [OCS]." Final Rule, Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 53 Fed.Reg. 10596, 10704 (April 1, 1988). Geophysical contractors conducting these surveys are subject to regulation under the Marine Mammal Protection Act (MMPA), 16 USC Secs. 1361-1406 (1982 & Supp. IV 1986), which flatly prohibits the taking of any marine mammal on the high seas except under circumstances not applicable here. 16 U.S.C. Sec. 1372(a)(1).[4]
 
 
 40
 Nor does the Secretary's rejection of some NMFS recommendations at the lease sale stage create a risk of oil spills at later stages. As with NEPA, the Secretary must comply with ESA at every step of the oil development process. Before the lessees can proceed to the exploration stage, the Secretary must "implicitly conclude that any approval does not affect an endangered species [and] take appropriate steps to insure, on the basis of his previous consultation with the [NMFS], the absence of jeopardy to an endangered species; or reinitiate formal consultation." Village of False Pass, 733 F.2d at 611 (citation omitted). Lessees must pass through the same approval and review process prior to the production and development stage. While there may be "minor changes in the Secretary's discretion" at later stages in the OCSLA process, such changes are relatively insignificant. Id. at 615.
 
 
 41
 In light of the protective steps implemented at the lease sale stage, the improbability of an oil spill risk arising at this stage and the opportunity for the Secretary to take further action at later stages in the process, we conclude that the Secretary has fulfilled his responsibility to "insure that agency action ... is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. Sec. 1536(a)(2).
 
 
 42
 Appellants make the additional claim that NMFS's biological opinion violated section 7(b)(4) of the ESA, 16 U.S.C. Sec. 1536(b)(4), by failing to specify the impact of any incidental takings of endangered whales. The NMFS concluded that any incidental taking would be prohibited under pertinent provisions of the ESA and section 101(a)(3)(B) of the MMPA, 16 U.S.C. Sec. 1371(a)(3)(B), and therefore did not include a statement specifying the impact of incidental takings. See Biological Opinion at 26, 2 FEIS at H-7. The NMFS's interpretation of its obligation under section 7(b)(4) was correct. Furthermore, despite the omission of any formal statement about incidental taking, the biological opinion does consider the effect of such adverse impact on the whales. For example, in its discussion of right whales, the opinion states that "[b]ecause this species is nearly extinct, we believe that adverse impacts to small numbers ... probably would have severe adverse effects on the entire population." Id. at 17, 2 FEIS at H-5. Therefore, we conclude that the NMFS's omission of a formal statement concerning incidental takings of endangered species was not arbitrary or capricious, and did not violate the ESA.
 
 V. Conclusion
 
 43
 The development of gas and oil reserves in an environmentally sound manner is a complex process: The Secretary must consider vast amounts of often speculative data and balance the demands of numerous interested parties in making plans that extend many years into the future. Under OCSLA's segmented approach, we must uphold the Secretary's actions so long as they meet the standards applicable to each stage. As the Supreme Court has noted, this approach was intended "to forestall premature litigation regarding adverse environmental effects that all agree will flow, if at all, only from the latter stages of OCS exploration and production." Secretary of the Interior v. California, 464 U.S. 312, 341, 104 S.Ct. 656, 671, 78 L.Ed.2d 496 (1984). Applying this analytical framework, we approve the Secretary's decision to go forward with Outer Continental Shelf Lease Sale 92, and affirm the district court's judgment.[5]
 
 
 
 [1]
 The omission of speculative information from an environmental impact statement prepared at the lease sale stage is permissible; however, an environmental impact statement which is incomplete due to the omission of ascertainable facts, or the inclusion of erroneous information, violates the disclosure requirement of 42 U.S.C. Sec. 4332(2)(C)
 
 
 [2]
 The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), are jointly responsible for administering the ESA; the scope of their respective jurisdictions is set forth in 50 C.F.R. Sec. 402.01(b) (1987)
 
 
 [3]
 An incidental taking "refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. Sec. 402.02 (1987)
 
 
 [4]
 Section 17 of ESA, 16 U.S.C. Sec. 1543, states that unless otherwise provided, ESA shall be preempted by any more restrictive applicable provision of MMPA
 
 
 [5]
 By separate order, we grant appellees' motion to stay the injunction pending remand to the district court